In re Mary REILAND, Debtor.

No. BKY 05–37729.

United States Bankruptcy Court, D. Minnesota.

Feb. 28, 2008.

Kenneth Corey–Edstrom, Larkin, Hoffman, Daly and Lingren Ltd., Bloomington, MN, for debtor.

Bradley J. Halberstadt, Stewart, Zlimen & Jungers Ltd., Roseville, MN, for creditor.

## ORDER RE: TRUSTEE'S OBJECTION TO DEBTOR'S SECOND AMENDED CLAIM OF EXEMPTION

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 7 case came on before the Court on January 8, 2008, for hearing on the Trustee's objection to the Debtor's amended claim of exemption in certain rights under a private policy of disability insurance, and in certain funds on bank deposit. Trustee Patti J. Sullivan appeared in person and by her attorneys, Matthew R. Burton and Chad A. Kelsch. The Debtor appeared by her attorney, Kenneth Corey–Edstrom. Paige M. Fitzgerald, Assistant Attorney General, appeared for the State of Minnesota. The following order is based upon the objection, the Debtor's response, and the arguments of counsel.

## PROCEDURAL HISTORY

The Debtor filed for relief under Chapter 7 on October 4, 2005. As an asset, she listed a "Claim for Disability Insurance policy against Mass Mutual Insurance Co." on her Schedule B. In her Schedule C she claimed this asset as exempt under Minn. Stat. § 550.39. While it is not self-evident from the wording of the schedules, this asset consists of an ongoing right to receive periodic payments under a policy of disability insurance under which the Debtor is the insured. (The Debtor was receiving such payments when she filed for bankruptcy, and continued to do so thereafter.) The Debtor also scheduled a balance on deposit in a checking account, valued at $8,000.00. She claimed that as exempt under the same statute, on the grounds that these funds were the proceeds of her rights under the insurance.

The Trustee of her bankruptcy estate timely objected to these claims of exemption. Via an order entered on November 1, 2007, the Court sustained the objection. The holding was that the statute in question violated Article I, Sec. 12 of the Minnesota Constitution and hence was unenforceable against the Trustee. *In re Reiland*, 377 B.R. 232 (Bankr.D.Minn. 2007).

In response, the Debtor took two separate actions. She filed a motion for relief from the order (styled as one "for reconsideration"). And, on November 9, 2007, she filed a second amended Schedule C,[1] to assert another Minnesota statute as a basis for exempting her right to disability insurance benefits.

Her motion "for reconsideration" is addressed in a separate order, entered today. The Trustee's timely-filed objection to her amended claim of exemption is the matter at bar.

## DISCUSSION[2]

### *The Amended Claim of Exemption*

Via the current amendment, the Debtor made three changes to her previous claims of exemption to her rights to receive disability insurance benefits under the Mass Mutual policy, and the alleged proceeds of those rights.

First, she added to the previously-noted description of the asset the following language: "Claim for Insurance Benefits and payments from policy under alternative theories." This change does not broaden or otherwise alter the scope of the assets in contention between the Debtor and the Trustee.

Second, she added a statutory citation to the one previously given for the "Law Providing Each Exemption." The new, and second cumulative, citation is to Minn. Stat. § 550.37(24).

Third, she added a footnote to her previous claim of exemption in the funds on deposit in her checking account: "Amounts in checking account are fully exempt under either 550.37(24) or under 550.39."

### *Trustee's Objection*

The Trustee objected across the board to the theory of exemption added via the current amendment. She advances four separate arguments in her objection. Three of them are of broader scope, going to the propriety of the act of amendment.

1. The Debtor had filed a first amendment to her Schedule C in December, 2005. The changes in that one involved assets other than the ones now at issue. For brevity, the amendment now in controversy will be termed "the current amendment."

2. This section will include conclusions of law and (where appropriate) findings of fact, in a mixed format.

The other goes to the substantive applicability of Minn.Stat. § 550.37, subd. 24, as newly-invoked by the Debtor.[3]

### 1. *Res Judicata*

The Trustee's broadest theory is that the doctrine of *res judicata* bars the Debtor from now claiming an exemption to these assets under a different statute, after the disallowance of her original claim of exemption.[4]

Both sides argue *In re Ladd*, 450 F.3d 751 (8th Cir.2006) to support their positions. *Ladd* was the first time in which the Eighth Circuit addressed the application of *res judicata*, or claim preclusion, to a debtor's amendment of a claim of exemption to an asset after the disallowance of a prior claimed exemption. Reprising the general principles of *res judicata*, the *Ladd* court noted that a final adjudication on the merits precludes parties (or those in privity with them) from relitigating the same "claim," i.e., the same cause of action, in a second legal proceeding. 450 F.3d at 753. "An action is the 'same,' for the purposes of *res judicata* if it turns on the 'same nucleus of operative facts as the prior claim.' " *Id.* (citing *Daley v. Marriott Int'l, Inc.*, 415 F.3d 889 (8th Cir. 2005)). Where a debtor amends a claim of exemptions to designate a statute different from the one on which an earlier, court-disallowed one was premised, the "nucleus of operative facts" for each claim of exemption is established by the factual re-quirements of the respective statutes—i.e., the characteristics or attributes of the asset that would qualify its owner for the protection of an exemption from claims of creditors. 450 F.3d at 753. Thus, in *Ladd*, the disallowance of a prior claim of homestead exemption under Minnesota state law did not preclude the debtors from asserting a right to a homestead exemption under 11 U.S.C. § 522(d)(1). The reason was that the entitlement to the respective exemptions turned on different facts. 450 F.3d at 754–755.

This is the unequivocal, central holding in *Ladd*, under which the intermediate appellate ruling in the same case, 319 B.R. 599 (8th Cir. BAP 2005), was reversed.[5] Its implication for this case is unmistakable.

The following facts are relevant to the right to an exemption under Minn.Stat. § 550.37, subd. 24: the pre-petition existence of an employment relationship under which the right to receive payment was a benefit to the debtor as an employee; the present value of the debtor's right to receive payments under that benefit; and the reasonable necessity of future payments to the support of the debtor and the debtor's benefits, to the extent that the present value exceeds the sum currently specified under the statute.[6] Under the much-simpler terms of Minn.Stat. § 550.39, the right to an exemption is established through the pre-petition exis-

---

3. The following treatment will not proceed in the order of the Trustee's original briefing, but rather via the scope and substantive significance of the component theories. In the text of her objection the Trustee enumerated five separate points. Three of these overlap as to one substantive theory; two unnecessarily split out the same legal theory over separate assets that are subjected to it by the current amendment.

4. This theory is the broadest because the substantive merits of the Debtor's new statutory theory would not be reached, if the Trustee is correct.

5. The panel opinion of the Eighth Circuit incorporated most of the reasoning of the dissenting opinion at the B.A.P. level, 319 B.R. at 607–609.

6. For brevity, the reference to the statutory provision will be "subd. 24" for the balance of this decision.

tence of a policy of accident or disability insurance under which the debtor was an insured or a beneficiary entitled to payment. The showings required under these two statutes are different nuclei of operative fact, for the purposes of *res judicata.* Because of that, the disallowance of the Debtor's earlier claim of exemption did not preclude her from claiming the exemption asserted in the current amendment. And that is the end of the story, for this theory of objection.[7]

### 2. Bad Faith

The Trustee's second theory of objection is almost as wide-spectrum as the first. As the Trustee would have it, the Debtor acted in bad faith in relation to the current amendment, so it should be denied legal effect.

The Trustee and the Debtor again argue from the same Eighth Circuit decision, this time *In re Kaelin,* 308 F.3d 885 (8th Cir. 2002); and again, they urge diametrically-opposed outcomes. Like *Ladd, Kaelin* was the Eighth Circuit's first treatment of an issue from the general context at bar, a debtor's attempt to amend a claim of exemptions after litigation and judicial disposition of the original. After recognizing the general policy underlying Fed. R. Bankr.P. 1009(a)[8], toward liberality in allowing a debtor to amend claims of exemption, the *Kaelin* court recognized that "bad faith on the part of the debtor and prejudice to the creditors" were "two recognized exceptions to this rule" of lenity toward debtors' attempts at amendment. 308 F.3d at 889. *See also In re Ladd,* 450 F.3d at 755; *In re Bauer,* 298 B.R. 353, 356 (8th Cir. BAP 2003).

 Clearly, a debtor's bad faith in this context must involve some sort of positive, concerted intent to delay, frustrate, or prevent the bankruptcy estate from realizing on the value of the subject assets. A mere passage of time between the original and amended claims of exemption, standing alone, does not support an inference of such intent. *In re Ladd,* 450 F.3d at 755; *In re Kaelin,* 308 F.3d at 889. A debtor's attempt to hide an asset during the bankruptcy process "will generally support a finding of bad faith." *In re Kaelin,* 308 F.3d at 890. A persistent and knowing concealment of the true value of an initially-scheduled asset can constitute such an "attempt[ ] to hide," meriting a finding of bad faith and the resultant denial of legal effect to an amendment that would increase the recited value and other-

---

7. In his briefing, the Trustee's counsel gave lip service to *Ladd* and recognized its focus on the nuclei of operative fact entailed by successive claims of exemption. However, he went on to quote at length from this Court's earlier decision, *In re Walls,* 249 B.R. 506 (Bankr. D.Minn.2000), for his otherwise-summary proposition that *res judicata* still precluded the Debtor from making the amendment at bar. *Walls* (and its predecessor-decision, *In re Marshall,* 224 B.R. 399 (Bankr.D.Minn. 1998) (Kressel, J.)) conceived of the single and unitary act of asserting an exemption, performed with the initial bankruptcy filing or soon after it, as the "claim" for the application of *res judicata*—no matter what the theory of exemption and no matter the legal and factual requirements to meet that theory and its alternatives. In *Ladd,* the Eighth Cir-

cuit's conception of "claim," in the context of a bankruptcy case, was deeper (in the sense of being more directly resonant with the wording of the traditional definition in the preclusion doctrines) but simpler and less abstract. The Eighth Circuit's analysis was a tacit but unequivocal rejection of the underlying theory of *Walls* and *Marshall.* Those decisions no longer have any vitality.

8. The relevant text of this rule is:

(a) **GENERAL RIGHT TO AMEND.** A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed. The debtor shall give notice of the amendment to the trustee and to any entity affected thereby . . .

wise permit an exemption to the greater amount. *In re Bauer*, 298 B.R. at 357.

To make out her case on bad faith, the Trustee points to only four circumstances. First, there is the two-year delay between the Debtor's original claim of exemptions and the current amendment, with the amendment not coming until after the first one was disallowed. Then there is the allegation of the Debtor's "steadfast[ ] refus[al] to turn over non-exempt property of the estate and ... active[ ] frustrat[ion of] the Trustee's efforts in recovering assets." Third is the fact of the Debtor's collection and expenditure of over $8,000.00 per month in benefits from the disability insurance in question, during the pendency of the Trustee's first objection, to a total of over $200,000.00. Finally, the Trustee complains of the "substantial time and effort litigating with [the Debtor] at every turn," that she and the estate have expended and made.

At a glance, this has the semblance of kitchen-sinking the Debtor. However, it really is no more than a weak-kneed and insignificant showing toward the urged inference.

Unlike *Bauer*, this case does *not* involve an overt fraud on the court and the administrative process in bankruptcy. The Debtor disclosed the existence of her disability-insurance rights in her earliest filings in the case; and to all appearances from the record at bar, she produced a reasonable amount of evidence as to their nature and value when the Trustee requested it.

To be sure, after her bankruptcy filing the Debtor did receive ongoing benefit payments. These payments and their value were still subject to the Trustee's unresolved objection, and hence were still property of that estate; the Debtor proceeded to spend them. However, she did not do so in knowing disregard of a trustee's express directive to segregate and preserve the property, or while she was on clear notice that she had no right to dissipate it. (There is no evidence in the record that the Trustee made an unequivocal demand that the Debtor surrender each benefit payment to her upon receipt, or any accrued proceeds of past payments, before the November, 2007 ruling on the Trustee's first objection.) Thus, *In re Markey*, 378 B.R. 594 (Bankr.D.Minn.2007) does not furnish a rationale to tag the Debtor with bad faith in the amendment.

The fact of the delay in resolution of this dispute is not fairly attributed to the Debtor, either. The Trustee's choice of litigation counsel required a judicial reassignment of this case; the attorneys structured the litigation to explore factual issues through discovery before they brought the constitutional issue to the Court; when the Trustee then pushed the constitutional issue, the Court was statutorily required to invite the intervention of the State; the State's counsel required time to get up to speed; and the Court had to take the constitutional challenge under advisement, given the extraordinary nature of the relief that the Trustee (and the Trustee alone) was requesting. The Trustee insinuates that the Debtor should have forgone her reliance on Minn.Stat. § 550.39 immediately after the Trustee filed her objection; but this is belligerent and inappropriately tendentious. Any reviewing court had to presume the statute constitutional on its face, *In re Haggerty*, 448 N.W.2d 363, 364 (Minn.1989), and the onus of demonstrating a basis for constitutional invalidation lay entirely on the Trustee, *McGuire v. C & L Restaurant, Inc.*, 346 N.W.2d 605, 611 (Minn.1984). The Debtor cannot be tarred with a particularized bad faith toward the bankruptcy process now, for putting the Trustee to her

test on the primary theory of her first objection.[9]

Finally, the estate has incurred the bulk of its substantial transactional costs thus far because the Trustee chose to take a sally at Minn.Stat. § 550.39, and only because of that. Again, given the allocation of burden and onus under Minnesota law, the Debtor is not to be faulted for the mere act of opposing her. (Nor, for that matter, is the State—the participation of which made the proceedings at least as involved as did the Debtor's alone.)

The Trustee elicits no more points of fact than those. They do not furnish the critical mass for an inference of bad faith under *Kaelin,* in any of the cited points or in all of them collectively. This second theory is no basis either, to deny the Debtor the right to an adjudication on the legal merits of her amended claim of exemption.[10]

### 3. Assignment of "Unknown" Value to Rights to Payment

■ When the Debtor originally listed and claimed an exemption for her "Claim for Disability Insurance policy," she assigned it a value of "Unknown" on all of her bankruptcy schedules. In her original objection, the Trustee did not take issue with this. When the Debtor filed the current amendment, she did not alter the notation of value. The Trustee now ob-

jects, terming the assignment of "Unknown" value "an attempt to circumvent the limits placed on such exemptions as set forth in the statutes."

The Trustee's point is not entirely clear, at least as her counsel has briefed it. If her idea was to head off the deemed allowance of an exemption to the full value of the subject asset upon the expiration of the period for objection to the amendment, some sort of formal staking of position was prudent and an objection to exemptions was an appropriate vehicle for it. *Compare Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) (trustee's failure to object to claimed exemption of assets scheduled with value of "unknown" resulted in allowance of exemption to all rights in asset, even though neither state law nor Bankruptcy Code provided exemption for asset of that specific type and neither state law nor 11 U.S.C. § 522(d) gave debtor "a right to exempt more than a small portion of [the] proceeds" of the asset) *with In re Wick,* 276 F.3d 412, 416 (8th Cir.2002) (in case where debtor has elected exemptions under 11 U.S.C. § 522(d) and has only $3,925.00 of unapplied exemption rights under 11 U.S.C. § 522(d)(5), listing value of claimed exemption for contingent and unliquidated property right under stock option as "unknown" does not "render [debtor's rights in the asset] fully exempt";

---

**9.** The Trustee's accusation of intransigence on the Debtor's part is particularly laughable, given that none of the participating attorneys divined the import of *Medill v. State,* 477 N.W.2d 703 (Minn.1991) and *Estate of Jones by Blume v. Kvamme,* 529 N.W.2d 335 (Minn. 1995), as set forth in the decision on the Trustee's first objection. In hindsight, this was one that simply had to play its way out in argument, submission, and adjudication.

**10.** Despite *Kaelin's* fairly strong statement and its status as binding appellate precedent, trustees in this district persist in making pro forma objections to amended claims of ex-

emption under the bad faith theory. Generally, they are doing so with no more than the bare, sparse skeleton of cited circumstances as were presented here—and with such lack of focus, the practice is becoming tiresome. The *Kaelin* court gave substantial, even prima facie weight to the general dictate of Fed. R. Bankr.P. 1009(a). 308 F.3d at 889. Absent strong proof of bad acts or bad results brought about by a debtor's intentional conduct, that thrust is to prevail—even if the result causes some judicial discomfiture in a more general sense. 308 F.3d at 891.

only that portion of asset's value protectible via unapplied exemption rights under § 522(d)(5) is exempted, "not the entire asset"—even where trustee did not timely object to claim of exemption as phrased and made).

However, the Trustee then maintains: "Accordingly, the Debtor's interest in 'the claim for the insurance benefits and payments from policy' should remain the property of the bankruptcy estate and the Debtor's claim of exemption denied." The import of these words is a complete disallowance of any claimed exemption—not just a limitation to the value protectible under law (here, the amount specified in subd. 24).[11]

The Trustee's counsel cites *Wick* for his proposition that "[i]n order to be effective, property claimed as exempt must be identified with specificity and its value must be stated." *Wick* does not stand for this proposition. It certainly does not support the outcome counsel urges, all-destructive of any exemption right available to a debtor under invoked statute.

Thus articulated, this objection is without merit. The Debtor's assignment of a value "unknown" most likely "signal[ed] nothing more than that the asset has not been valued or that the [D]ebtor is unsure

of how to come up with an accurate market value." *In re Wick*, 276 F.3d at 416.[12] And even had the Trustee not objected on this theory, *Wick* would have provided a check and limitation on the Debtor's ultimate realization from the disability insurance coverage, to be exercised in some other, future procedural context.[13] If subd. 24 does furnish the Debtor with an exemption for this asset, its value will be limited to that prescribed in the statute. But given the way the Trustee expressly framed this theory, her objection under it is to be overruled.

### 4. Applicability of Minn.Stat. § 550.37, Subd. 24 on its Merits

The Trustee's last theory of objection requires the substantive application of subd. 24. Paragraph (a) of that statute provides that the following property is, per Minn.Stat. § 550.37, subd. 1, "not liable to attachment, garnishment, or sale on any final process, issued from any court":

> **Subd. 24. Employee benefits.** (a) The debtor's right to receive present or future payments, or payments received by the debtor, under a stock bonus, pension, profit sharing, annuity, individual retirement account, Roth IRA, individual retirement annuity, simplified employee pension, or similar plan or contract

---

**11.** For those amounts, see text of statute quoted *infra* at p. 789, n. 19.

**12.** Yes, the Debtor could have used an entry that read something like "$8,500.00 per month in benefits, payable during term of disability." This would have attached a number to the value, at least in terms of unit-measure. But, given the indeterminacy of the length of the term, this would have been no more illuminating than "unknown." And one would have to have some idea of the projected length of the term of disability—actuarially determined, medically predicted, or otherwise—for a reduction to present value. Such an exercise would be necessary, were the court required to actually apportion rights for

the allowance of an exemption under subd. 24. But given the complexities of the asset, requiring a debtor to do so for an initial bankruptcy schedule would be unfairly burdensome.

**13.** As was the posture in *Wick*—an adversary proceeding brought by the trustee to compel turnover of the proceeds of the asset in controversy, commenced twenty-two months after the deadline for objecting to exemptions, a like amount of time after the trustee "was led to believe that [the debtor's] exemption had been properly claimed" as to value, and nine months after the debtor's Chapter 7 case was closed. *In re Wick*, 249 B.R. 900, 906–907 (Bankr.D.Minn.2000).

on account of illness, disability, death, age, or length of service, to the extent of the debtor's aggregate interest under all plans and contracts up to a present value of $30,000 and additional amounts under all the plans and contracts to the extent reasonably necessary for the support of the debtor and any spouse or dependent of the debtor.

■ Based on early application of this statute in local bankruptcy cases, the Minnesota state courts recognized that "[b]enefits which are exempt under subdivision 24 are those derived from an employment relationship or from self-employment endeavors." *Westinghouse Credit Corp. v. J. Reiter Sales, Inc.*, 443 N.W.2d 837, 839 (Minn.Ct.App.1989) (citing *In re Raymond*, 71 B.R. 628, 630 (Bankr. D.Minn.1987)). The focus is on the way in which the debtor *obtained* the interest in the asset described in the statute. *Deretich v. City of St. Francis*, 128 F.3d 1209, 1212 (8th Cir.1997). This must be via an employment relationship with an entity that provided the rights as a benefit to employees. *Id.*[14]

Both of the assets that the Debtor now claims as exempt under subd. 24 are directly linked to a policy of disability insurance through Mass Mutual Financial Group, Policy No. 9519758, under which the Debtor was the insured and beneficiary.[15] Four D Incorporated, a corporation, had purchased the policy a number of years before early 2002. Four D was the entity through which the Debtor had oper-

ated her business. It paid the monthly premiums on this policy as a benefit of the Debtor's employment by the corporation.

The Debtor drew her last paycheck for salary from Four D in February, 2002. When she drew money from the business after that, she categorized it as repayment of loans that she had previously made to the corporation. She worked in the business on a part-time basis for some period of time after February, 2002. Ultimately, she closed the business in June and July, 2003.

Under the original issuance of the policy, Mass Mutual billed Four D for the premiums. At the Debtor's instance, Four D "assigned the policy to" the Debtor, and Mass Mutual began billing the Debtor for the premiums at her home address. This action was coordinated in some way with the Debtor's wind-down of corporate operations in mid–2003. Mass Mutual confirmed the change of address by a letter to the Debtor dated April 23, 2003. This communication does not mention an assignment of the policy.

The record contains monthly billing notices for the policy for premiums due March 12, 2003, and April 12, 2003, addressed to Four D at its Burnsville, Minnesota business address. It also contains documents entitled "Second Notice of Payment Due" for premiums that were to be paid by June 22, 2003, and September 22, 2003, addressed to the Debtor individually at her Apple Valley, Minnesota home address.[16] The notice for the due date of

---

**14.** In the alternative, the source may be "from self-employment endeavors," *Westinghouse Credit Corp. v. J. Reiter Sales, Inc.*, 443 N.W.2d at 839, in which the funds used to purchase the rights in the asset were "directly derived ... from [the] self-employment endeavor," *In re Martin*, 297 B.R. 750, 753 (8th Cir. BAP 2003). This alternative does not apply to the facts here.

**15.** This, and the remaining recitations in the next seven paragraphs, are findings of fact, or observations of the state of the record that are relevant to fact-finding. The findings are based on the uncontroverted documents and factual statements of the Debtor that the parties put into the record for this objection.

**16.** The latter two notices contain advisories that they were "prepared on" July 18, 2003 and October 17, 2003, respectively—both of

June 22, 2003, has a holographic notation on it (hand unknown), that reads "paid—8–15–03."

The record contains no billing statement for a premium due in May, 2003.

The record suggests that this policy was subject to lapse for nonpayment of any premium when due, making coverage effective from payment date to payment date alone.[17]

In mid–2003, the Debtor applied for benefits under the disability insurance, on the ground that severe depression rendered her totally disabled. Via a letter dated December 30, 2003, Mass Mutual notified the Debtor that her claim had been approved, for a period of total disability commencing May 29, 2003.[18]

Mass Mutual issued the Debtor a check for benefits accrued between May 29, 2003 and the date of its approval, taking into consideration a 90–day waiting period under the policy. It also commenced making monthly payments to her. She continued to receive these payments, through and after the date of her bankruptcy filing. After upward adjustment under the policy's indexing feature, the payments came to approximately $8,500.00 per month as of the date of her bankruptcy filing.

The Trustee has raised several points under this theory of objection. Her threshold argument is that the Debtor's right to receive payments under the Mass Mutual policy does not even qualify as an asset exemptible under subd. 24; as the Trustee would have it, no portion of its value is protected from creditors under that statute.[19]

Initially, the Trustee concedes that the beneficiary's rights under the disability insurance had the requisite relationship to the Debtor's employment by Four D at one time, because Four D had paid the premiums as a benefit for the Debtor (as a salary-earning employee) while it was a going concern.[20] However, the Trustee insists, the Debtor later succeeded to all rights as insured and policy-holder in her individual capacity, by herself paying the premiums after Four D could not do so and then went defunct. Thus, the Trustee argues the Debtor owned the policy and all rights under it in this capacity, at all times relevant to her claim of exemptions; and therefore the rights cannot qualify as an employee benefit under subd. 24 for the purposes of this case.

those dates being after the stated due dates for payment. The record contains no explanation for this.

17. Four D had maintained a second policy of disability insurance on the Debtor through Mass Mutual, under Policy No. 9818715. Per Mass Mutual's notice to the Debtor, that policy had lapsed effective May 12, 2003, for failure to make the premium due then.

18. In approving her claim, Mass Mutual also took into consideration a four-week period of proven disability in August–September, 2002. However, it declined to find the Debtor disabled for any time between September 15, 2002 and May 29, 2003, because she had not provided supporting medical evidence.

19. At least in passing, the Trustee raised the question of whether the Debtor's past receipts under the policy had "already exceeded the [statutory] cap" of subd. 24. This will be treated henceforth as an objection based on both aspects of the cap, i.e., the "floor" amount of present value, protected in its entirety as exempt ($57,000.00 as of the date of the Debtor's bankruptcy filing), and that portion of any balance that would be reasonably necessary to the Debtor's support thereafter. Those are issues for yet another day, which *may* come *after* another day.

20. The Trustee has not argued that a policy of disability insurance is not a "similar plan or contract" within the meaning of subd. 24. She will be deemed to have conceded this point to the Debtor, for the balance of proceedings on her objection.

**790**

■ Clearly, the status of the Debtor's rights under the policy, i.e., as a benefit of employment or not, must be measured as of a certain point in time. The Trustee never identifies that date with any specificity, whether by the calendar or with reference to the procedural sequence of bankruptcy. However, this question must be answered, as the very first one on the Trustee's threshold argument: is the status of the Debtor's rights under the disability insurance policy, i.e., as an employee benefit within the scope of subd. 24, to be determined as of the date on which she filed for bankruptcy, as of the date on which she qualified to receive those benefits, or as of some other date? Neither side even recognized this issue, let alone stated and developed a position on it.

This is an issue of law, and it can be resolved now. When the Debtor filed for bankruptcy, the property interest she held in relation to the policy had the form of a matured beneficiary's right to receive ongoing payments under the policy, coupled with a waiver of the obligation to make premium payments. It was to bear those fruits for so long as the Debtor remained disabled under the policy's terms. This fully-vested property right, with substantial current and future value, is the asset that passed into the bankruptcy estate— not the contingent, unmatured, and entirely intangible rights of an insured and beneficiary to current and future coverage under a policy that was not in a payout status.

The asset that passed into the estate thus achieved its actual value and administrable form before the Debtor's bankruptcy filing. When it took that form (and when the Debtor filed for bankruptcy), it was at the stage in the development of rights under disability insurance that most directly matches the property right described in the statute's text: an actual, choate "right to receive present or future payments." It sprang from a policy that had a specific status and source of ownership when the right to current payment accrued. The ownership had a specific contemporary relationship to the status of insured and beneficiary under the policy.

These characteristics bear on the status of such a property right as the fruit of an employee benefit under subd. 24: generally, and logically, the owner and the party responsible for premium payments for such a policy is the employer, if the status of insured is being granted to an employee as a benefit of employment. It was clearly that way here, up to at least April, 2003; Four D was being billed for the premiums as the owner of the policy. With this policy in an unbroken chain of payout status through the Debtor's bankruptcy filing, the date as of which her rights as insured and thus beneficiary would qualify to be protected under subd. 24 is the date on which she became eligible to receive them.[21]

■ This brings us to the second question on the threshold issue, equally unacknowledged by either side. It is one of

---

**21.** Under this disability insurance policy, the right to current payment accrued (matured) because the Debtor became disabled during the term of coverage, i.e., during the period for which a premium had been paid. If the Debtor had not become disabled, there would be no benefit accrued or in payment. (And, there would be no real-life value to the asset to be in contention between the Debtor and the bankruptcy estate.) The Debtor had to have suffered a disability during a period when the premium was paid current, or Mass Mutual would not have honored her claim under Policy No. 9519758. (Per the finding in n. 17, *supra*, Mass Mutual had denied the Debtor's claim for benefits under a second disability policy because the coverage had lapsed due to nonpayment of premium before the date of her disability.)

mixed law and fact: when did the Debtor take ownership of the disability insurance policy itself, in her individual right, from Four D, which had previously owned the policy and afforded the status of insured and beneficiary to the Debtor as a benefit of her employment?

The parties' failure to recognize the salience of this specific point is more confounding, because they went only so far on it, in a vague legal argument and an incomplete presentation of evidence, and then they both stopped.

The Debtor attests to having procured Four D's assignment of the ownership of the policy to herself, at or around the time when Four D lost the resources to continue paying the premiums. However, she says nothing about the means through which the assignment was effected, the dates on which the documents effecting the assignment (if any) were executed, the means by which the assignment was presented to Mass Mutual and recognized by it, or the actual dates on which Four D made its last premium payment and she made her first from her own resources. More frustratingly, the Trustee produced documentary evidence of the identity of the parties successively billed for several monthly premiums (a component fact that goes to several of the higher-level facts just noted). But the dates of issuance or effectiveness for these documents only spanned the date crucial to the resolution of this issue, May 29, 2003; they did not hit or even graze it. The missing of the target leaves the crucial component fact indeterminable at present.

To make it absolutely clear: the date on which the Debtor qualified to receive an ongoing benefit payment was May 29, 2003—when, per Mass Mutual's finding, the Debtor was subjected to the longer-term, ongoing disability that prevented her from working. That date is the one on which her policy-based rights' status as an employee benefit under subd. 24 is to be determined. The record lacks contemporaneous evidence going to that status. There is no testimonial or documentary proof going to any of the following points of fact: did someone on behalf of Four D execute a written assignment to the Debtor, of the ownership of the policy? If so, when was that assignment executed? When did Mass Mutual receive and process any notice of the assignment and then formally recognize the assignment? And who was the addressee of the billing notice for the May, 2003 premium, who paid the premium for that month, when, and from what source? [22]

All of these subsidiary facts go to the question of when the Debtor assumed an individual ownership of the policy, as assignee or transferee from Four D. When that occurred, the rights under the policy (whether ripened to an entitlement to receive current benefits by then or not) ceased to be a benefit of the Debtor's employment by Four D. If it happened before May 29, 2003, the asset was not an employee benefit when it ripened and the Debtor's rights to it do not qualify for the exemption. If the transfer of ownership came after May 29, 2003, the current right to receive benefits would qualify under subd. 24, and the inquiry under the Trustee's objection would move on to the other requirements of that statute.

So, the Trustee's last theory of objection cannot be resolved on the present record, on the plane of either law or fact, and as to

---

**22.** This points right to the frustrating gap in the Trustee's documentary presentation thus

far.

either category of asset claimed exempt under subd. 24.[23]

The parties and their counsel have some work to do to complete an acceptable presentation on this issue. By way of guidance, counsel should take heed of the following rulings and observations. While not probative of the central component facts, or conclusive as to the ultimate facts, the Trustee's proof thus far was sufficient to meet her initial burden of production under Fed. R. Bankr.P. 4003(c). This shifted the burden of production of evidence over to the Debtor. The satisfaction of that burden will turn on the sorts of transactions and documentary evidence identified previously. In any case, the Debtor will have the obligation to produce any such documents for the Trustee before an evidentiary hearing, via formal or informal discovery. It is logical to impose this obligation on her, and the burden to generate them into evidence; after all, she is the party who has them in her current possession, or has unquestionable and direct access to them if they are in the control of a third party.[24]

When it gets down to the actual hearing, only hard documentary proof—form written assignments, canceled checks, bank registers, correspondence, and the like—

will suffice, insofar as probity and credibility are concerned. Assignment documents produced from an insurer's files, especially on its own forms, will have vastly more credibility than anything informally self-generated by the Debtor or her business corporation, that now may be alleged to be contemporaneous with the events of 2003.[25]

Finally, the Debtor's personal testimony as to the making, manner, and source of premium payments, based on memory or otherwise, will have negligible credibility if presented as the sole proof, without the corroboration of documentary evidence.

Thus, an evidentiary hearing will be scheduled, to address the issues noted above—and any other aspects of the problems just discussed. The parties must now recognize those, the more nuanced analysis required by this dispute now having been set down in this order.

IT IS THEREFORE DETERMINED AND ORDERED:

1. The Debtor's second amended claim of exemptions is not barred by the doctrine of *res judicata.*

2. The Debtor did not act in bad faith when she made her second amended claim of exemptions, so it thus will not be deprived of force and effect on that ground.

---

**23.** Subd. 24 gives an exemption both for a property right prospective in nature—a "debtor's right to receive present or future payments"—and one currently in existence—"payments received by the debtor." Thus, if the funds on deposit in the Debtor's checking account were indeed traceable back to the payments actually received from Mass Mutual, their qualification as an asset within the scope of subd. 24 will rise or fall with the qualification of the intangible right to receive ongoing payments.

**24.** Again, to make things really clear: Mass Mutual undoubtedly will respond most easily and readily to a request made by the Debtor, its insured, for documents from its files that relate to the assignment, billing, and premium

payment. So will the financial institution(s) with which the Debtor had banking relationships at the time.

**25.** In another adversary proceeding in this case, the Trustee's counsel has insinuated that the Debtor or other persons in consort with her have fabricated documents after the fact. The truth of that accusation has not been determined. It is beside the point whether it is true, or whether (even if true) the conduct would be reprised here. Neither the Court nor the parties to this matter need the distraction of this side issue. If the assignment was effected according to the books (as Mass Mutual reasonably would be expected to have required), formal documentary proof will be extant and forthcoming.

3. The Debtor's claim of exemption to her rights under a policy of disability insurance through Mass Mutual Financial Group is not deprived of force and effect by her scheduling of a value of "Unknown" to those rights.

4. On *March 6, 2008, at 3:30 p.m.,* the Court will convene a status conference on the balance of the threshold issue posed by the Trustee's objection to the Debtor's second amended claim of exemptions, as identified in Part 4 of the discussion in this order. Counsel shall attend in person. They shall be prepared to identify an early date on which an evidentiary hearing may be held, on that threshold issue: whether the Debtor's rights under the disability insurance policy through Mass Mutual Financial Group were an employee benefit within the scope of § 550.37, subd. 24, at the time relevant to her second amended claim of exemption thereto.

5. If the Court determines that the Debtor's rights under the insurance policy through Mass Mutual are within the scope of Minn.Stat. § 550.37, subd. 24, a further evidentiary hearing will be convened as to the remaining issues posed by the Trustee's objection to exemptions.